a

# UNITED STATES DISTRICT COURT
## WESTERN DISTRICT OF LOUISIANA
### SHREVEPORT DIVISION

| | |
|---|---|
| **WESLEY SHANE AUSTIN SR,** Petitioner | **CIVIL DOCKET NO. 5:19-CV-00003 SEC P** |
| **VERSUS** | **CHIEF JUDGE S. MAURICE HICKS, JR.** |
| **ROBERT TANNER,** Respondent | **MAGISTRATE JUDGE PEREZ-MONTES** |

## REPORT AND RECOMMENDATION

Before the Court is a Petition and Amended Petition for Writ of Habeas Corpus under 28 U.S.C. § 2254 filed by counsel on behalf of Petitioner Wesley Shane Austin, Sr. ("Austin"). Austin challenges his conviction and sentence imposed in the Twenty-Sixth Judicial District Court, Bossier Parish.

Because Austin fails to establish his entitlement to relief, his Petition and Amended Petition (ECF Nos. 1, 18) should be DENIED and DISMISSED WITH PREJUDICE.

## I. <u>Background</u>

Austin was convicted by a non-unanimous jury of attempted second-degree murder and home invasion. He was sentenced to consecutive terms of 30 years of imprisonment for the murder conviction and 20 years for the home invasion conviction. *State v. Austin*, 49,061 (La. App. 2 Cir. 7/16/14); 146 So.3d 716, *writ denied sub nom. State ex rel. Austin v. State*, 2014-2323 (La. 9/18/15); 178 So.3d 140.

According to the Louisiana Second Circuit Court of Appeal:

1

In the early morning hours of July 23, 2011, Terry Gilpin ("Gilpin") was at his home sitting on his bed, while his friend Mark Williamson ("Williamson") was taking a shower in the bathroom nearby. Two men, at least one of whom was wearing a bandana as a mask, burst through the front door of the home, breaking it off the hinges in the process. Each man was armed, one with a pistol, the other with a sawed-off shotgun. One of the men came in the room threatening a frightened Gilpin, asking multiple times, "Where is it?"

Williamson had just finished his shower and was holding the door to the small bathroom closed while the two men were harassing Gilpin.  Next, one of the armed assailants began kicking the bathroom door to force it open.  Williamson, who was bracing the door, was able to keep it closed. At that point, the man with the shotgun approached the door and from very close range shot the door near the middle on the same level as the doorknob. The shot from the blast blew past Williamson's head, and the door hit him after the shot. The pellets from the shotgun blast made it to the bathtub, which contained several holes as a result. Once the door hit Williamson on the head, he fell down, and began playing dead.

Meanwhile, after the first shot was fired, the man with the shotgun attempted to cock the weapon, but it malfunctioned. He asked the other man for the pistol, which was unloaded at that point, and stated, "Give me the gun, I'm going to kill this mother."  The other man refused to comply with the request. The two men then exited the home, only to return shortly because they had forgotten the keys to their getaway car inside the house.  They attempted to knock in the front door again. This time Gilpin resisted by holding the door and throwing household items at the men.  In the melee, Gilpin somehow injured his shoulder. His shirt had a hole in it, and he was bleeding. After the men successfully recovered their keys, they left.

After an investigation, police arrested Christopher Weathersby ("Weathersby") and Wesley Austin ("Austin") for the incident. Cellphone records placed Austin in the area of the crime at the time of the offense.  Detective Roppolo conducted a recorded interview with Williamson.  Williamson stated he thought he heard the voice of Saunders King ("King") in the home the night of the crime.  After the interview with Detective Roppolo, Williamson was browsing King's Facebook page, and he saw Austin and recognized him as one of the assailants. He then notified Detective Roppolo.  His report to the detective was not taped.  Weathersby pled guilty to unauthorized entry of an inhabited dwelling.  Austin was charged by bill of information with attempted first degree murder and home invasion.

2

*Austin*, 146 So.3d 716, 721–22.

The appellate court further noted:

In this case, Weathersby pleaded guilty to unauthorized entry for his involvement in the crime. He testified that he came into Shreveport to traffic methamphetamine in order to pay off a $400 debt he owed. He encountered Austin at a convenience store, and followed him to Christa Walker's house to obtain the drugs to take back to Texas. Weathersby testified that this was his first encounter with Austin and that Walker and Austin obtained eight ounces of methamphetamine from Williamson. Weathersby testified he was to bring five ounces of those eight ounces back to Texas, which he said was to have a value of $100 per ounce, four ounces of which would be used for repayment of the $400 debt.

When Weathersby and Austin arrived at Walker's house, Weathersby testified that Austin and others were angry, and were saying that Williamson had provided them with drugs they believed were fake. He testified that Austin then pointed a gun at him and ordered him to leave with him to go get the money back or to "get the other stuff or whatever." Weathersby testified that he and Austin were told that Williamson was at a casino. They went to the casino and waited to confront Williamson until after he left. Weathersby testified that he and Austin followed Williamson to the Gilpin home.

Next, Weathersby testified, Austin pointed a sawed-off shotgun at him and gave him a pistol with the inscription "1911" on it. The pistol was not loaded, and Austin placed the clip for the pistol in his pocket, which contained ammunition. Austin ordered Weathersby to kick in Gilpin's door, and he complied. Austin approached Gilpin who was lying on a bed and asked, "Where is it?" Weathersby testified that Austin told him to kick in the door to the bathroom in which Williamson was showering. Weathersby complied, and the door immediately closed back. Weathersby heard a voice behind it. Weathersby then testified that Austin ran up to the bathroom door and fired the shotgun.

Photographs of the crime scene show that the bathroom was small and that the hole in the door from the blast was level with the doorknob and slightly left of the door's center toward the doorknob. The pellets from the shot reached the bathtub, and photographs show several holes in it from the shot. Weathersby testified that Austin attempted to cock the shotgun, but it jammed. Dr. Richard Lee Wigle, trauma surgeon and

3

Associate Professor of Surgery at LSU, testified the shot used was designed to kill a large animal but could also kill a human.

After Austin shot at the bathroom door, he asked Weathersby for the pistol and said, "Give me the gun, I'm about to kill this mother." Weathersby stated he did not give Austin the gun. At that point, Weathersby and Austin exited the home, but went back and kicked in the door again because Austin had left his keys inside. Weathersby testified that during the crime, Austin was wearing a green bandana on his face, and Weathersby was not wearing anything covering his.

Officer Brandon Masters testified that he found a green bandana at a travel trailer where Austin was staying at the time. This bandana was introduced into evidence. Austin's cellphone records were identified and analyzed by Detective Chad Madden and Officer Cortez Bridges, who each testified at trial. The records indicated that in the hours leading up to the crime, Austin was moving around Shreveport and Bossier City, and the records placed him in the area of Gilpin's home at the time of the crime.

Dustin Clotiaux, Austin's stepbrother, testified that Austin came to him to repair a gun that would not eject shells after firing. He testified that the weapon was a shotgun with a short barrel. He also stated that Austin possessed a Colt 1911 pistol. Christa Walker testified that on the night of the crime, Austin had a sawed-off shotgun at her home and left with Weathersby from her home on the night of the crime.

Terry Gilpin, who had been expecting Williamson to arrive on the night of the crime to celebrate his birthday, also testified. He testified that he was sitting on his bed with his computer while Williamson was taking a shower in the bathroom nearby. He heard a really loud bang come from the living room, as well as people running through the house. Gilpin stated that Williamson came out of the bathroom asking what was going on. He said that someone then kicked in the bedroom door and that two men wearing bandanas entered the room. One of the men looked under the bed, and started asking him, "where is it[?]" and then asked "if [Gilpin] wanted to die tonight." He testified he could hear Williamson in the bathroom and people trying to get into the bathroom. Gilpin testified he then saw a flash of light accompanied with the smell of smoke and a pop sound. He stated, "I remember a smaller guy,1 he like opened the gun in half, I guess, I don't know, to reload, to empty the shell, I'm not sure." Terry Gilpin also testified he was familiar with Saunders King since around 2002.

4

Williamson testified that he had exchanged methamphetamine with Heath Leggett and Saunders King, who, according to Weathersby and Christa Walker, were at Walker's house when Weathersby arrived on the night of the crime. Williamson testified that he was getting calls from King and Leggett about meeting up to provide them with methamphetamine on the night of the crime. King had been persistent that day about obtaining the drugs, so Williamson went straight to meet them when he came into Shreveport from Texarkana, where he was working. Williamson testified he then went to the casino. Williamson testified that after he left the casino, he drove to Gilpin's house, where he was staying that night. He testified that when he exchanged the drugs with Leggett and King, he spoke with Gilpin telling him he would be late.

When Williamson arrived at Gilpin's home, he took a shower. Soon after he finished, the front door came down, and the two offenders came in with guns. He admitted that he had not initially told detectives he thought it was Austin, but told officers that he thought he heard King. He explained that after the interview, he was scrolling through the cohorts of King on Facebook, where he saw Austin's picture. Williamson then reported to the detective that he believed Austin was the perpetrator.

Williamson testified that he was holding the door shut with his hands and bracing himself with his feet against the bathtub behind him because one of the intruders was attempting to kick the door open. At that point, he testified, he felt a gun blast right past his head. He stated that the door shifted forward and hit him on the head. After that, he played dead until the intruders left.

After a trial, Austin was convicted of attempted second degree murder and home invasion on May 22, 2013. On August 5, 2013, he moved for new trial, which was denied at the sentencing hearing the next day. At the sentencing hearing, Austin asked for a continuance to submit a letter from Williamson asking for leniency. The trial court denied the request, stating the letter would not affect its decision. Austin was sentenced to 30 years at hard labor without benefit of parole, probation, or suspension of sentence for attempted second degree murder. He was given a 20–year sentence for home invasion, the first five years to be served without benefit of parole, probation, or suspension of sentence. The sentences were designated to run consecutively.

*Austin*, 146 So.3d at 722-24.

Austin's sentences were affirmed on July 16, 2014. *Id.* On July 29, 2014, Austin submitted an Offender Funds Withdrawal Request form for postage to mail an application for rehearing. ECF No. 1-1 at 12. The request indicates that the legal document was mailed on August 1, 2014. *Id.* The document was received and filed on August 6, 2014. ECF No. 30-7 at 1. The appellate court denied rehearing on September 25, 2014. *See Austin*, 146 So.3d at 716; ECF No. 30-7 at 6.

On October 23, 2014, Austin submitted an Offender Funds Withdrawal Request for postage to mail a writ application to the Louisiana Supreme Court. ECF No. 1-1 at 13. However, the request notes that the legal document was not mailed until October 29, 2014. *Id.* The Louisiana Supreme Court issued a one-word denial on September 18, 2015. *State ex rel. Austin v. State*, 2014-2323 (La. 9/18/15); 178 So.3d 140. Austin sought no further review in the United States Supreme Court.

On December 5, 2016, Austin submitted another Offender Funds Withdrawal Request for postage to mail an application for post-conviction relief. ECF No. 1-1 at 15. The application was received and filed in the trial court on December 12, 2016. ECF No. 27-19 at 1. The application was denied on March 9, 2017. *Id.* at 8.

Austin submitted an Offender Funds Withdrawal Form Request to mail a writ application to the appellate court on April 5, 2017. ECF No. 1-1 at 16. The writ application was mailed on an unspecified date and denied.

Austin submitted an Offender Funds Withdrawal Form Request on July 6, 2017, to mail a writ application to the Louisiana Supreme Court. ECF No. 1-1 at 18.

The document was mailed on an unspecified date.  The Louisiana Supreme Court

denied the writ, finding that:

> The application was not timely filed in the district court, and relator
> fails to carry his burden to show that an exception applies. La.C.Cr.P.
> art. 930.8; *State ex rel. Glover v. State*, 93-2330 (La. 9/5/95), 660 So.2d
> 1189; *see also State ex rel. Hall v. State*, 99-0326 (La. 9/24/99), 871 So.2d
> 1071 (untimely writ does not "unfinalize" convictions or toll the
> limitations period of La.C.Cr.P. art. 930.8.).

*State ex rel. Austin v. State*, 2017-1235, p. 1 (La. 10/29/18); 255 So.3d 586.  Austin's

application for reconsideration was also denied.  *State ex rel. Austin v. State*, 2017-

1235 (La. 1/14/19); 260 So.3d 1216.

## II.   Law and Analysis

### A.   Austin's Petition is timely.

The Antiterrorism and Effective Death Penalty Act ("AEDPA") provides a one-

year statute of limitations for filing applications for writs of habeas corpus by persons

in custody pursuant to the judgment of a state court.  The limitations period generally

runs from "the date on which the judgment became final by the conclusion of direct

review or the expiration of the time for seeking such review. . . ."  28 U.S.C. §

2244(d)(1)(A).  Federal courts may raise the one-year limitations period *sua sponte*.

*See Kiser v. Johnson*, 163 F.3d 326 (5th Cir. 1999).

Because the Louisiana Supreme Court issued a one-word denial on direct

review, it appeared that the writ application was denied on the merits.  However, on

post-conviction review, the Louisiana Supreme Court indicates that the prior writ

application was not timely filed.  *See Austin,* 255 So.3d 586 (citing *State ex rel. Hall

v. State*, 99-0326 (La. 9/24/99), 871 So.2d 1071).  Since it considered the writ

application on direct review untimely, the Louisiana Supreme Court found that the post-conviction application was also untimely. *Id.* If the writ application on direct review was untimely filed, Austin's conviction became final when the time for seeking review in the Louisiana Supreme Court expired—on October 25, 2014—rather than December 17, 2015, 90 days after the Louisiana Supreme Court denied writs. If the conviction became final on the earlier date, the subsequent application for post-conviction relief was untimely, as is the § 2254 Petition.

Austin requested postage on October 23, 2014, before the time for filing in the Louisiana Supreme Court expired, but the writ application was mailed on October 29, 2014, four days after the time for filing had expired. ECF No. 1-1 at 13. If the writ application was tendered to the prison authorities for mailing on or before October 25, 2014, it should be considered timely under Louisiana's "mailbox rule." *See Causey v. Cain*, 450 F.3d 601, 605 (5th Cir. 2006) (under the "mailbox rule," a prisoner's legal document is deemed filed when he delivers the petition to prison officials for mailing to the district court); *see also Medley v. Thaler*, 660 F.3d 833, 840 (5th Cir. 2011).

The date a document was delivered to prison officials for mailing can generally be determined by reference to prison mail logs. *See Causey*, 450 F.3d at 604 (citing *Houston v. Lack*, 487 U.S. 266, 275 (1988)). However, no prison mail logs have been provided in this case. Austin's Offender Funds Withdrawal Request form only shows that he requested postage on Thursday, October 23, 2014, and the document was mailed on Wednesday October 29, 2014. ECF No. 1-1 at 13.

In *Williams v. Vannoy*, 17-CV-13281, 2019 WL 2469682, at *2 (E.D. La. June 13, 2019), the district court determined that an inmate's request for funds to be withdrawn did not establish the date a document was delivered to prison officials for mailing. The court relied on *O'Neal v. Cain*, 615 F. App'x 233, 234 (5th Cir. 2015), which found that a "request for funds to enable mailing of the petition . . . [did] not conclusively establish that filing in fact occurred on that day."

On the other hand, in *Wolfe v. Cain*, 09-CV-3366, 2010 WL 3801254, at *3 (E.D. La. Aug. 30, 2010), *report and recommendation adopted*, 2010 WL 3801236 (E.D. La. Sept. 22, 2010), the district court determined that a petitioner's request for funds to be withdrawn from his inmate account for a "Post Conviction Writ Application & Letter" to be sent to "Clerk of Court, P.O. Box 1569, Houma, La. 70360" was sufficient to be considered the date of filing. Likewise, the date of an inmate funds withdrawal request was considered the relevant date for the mailbox rule in *Harvey v. Andrews*, 09-CV-4200, 2010 WL 744944, at *4 (E.D. La. Feb. 26, 2010); *Jones v. Cain*, 13-CV-0599, 2015 WL 1978315, at *2 (M.D. La. Apr. 30, 2015); *Ficher v. Goodwin*, 14-CV-2281, 2017 WL 5125763, at *2 n.10 (E.D. La. Sept. 8, 2017); and *Noel v. Prince*, 09-CV-7730, 2010 WL 4364689, at *2 (E.D. La. Aug. 27, 2010).

Although the funds withdrawal request does not conclusively establish the date of mailing, it is sufficiently reliable. Moreover, the State has not produced any prison logs to refute Austin's assertion that the legal documents, including the writ application, were tendered for mailing with the fund withdrawal request. Considering October 23, 2014, as the date of mailing under the mailbox rule, the writ

application on direct appeal was timely filed in the Louisiana Supreme Court. Because the state law grounds for denying Austin's writ application were not evenhandedly applied in this case, "there is no bar to federal review and a federal habeas court may go to the merits of the claim." *See Matthews v. Cain*, CV 15-430, 2017 WL 3840854, at *7 (E.D. La. Sept. 1, 2017) (finding that, because the Louisiana Supreme Court did not evenhandedly apply Louisiana Code of Criminal Procedure article 930.3 and 930.8 in denying Petitioner's writ application in light of the mailbox rule, the post-conviction application was timely filed).

Thus, Austin's conviction became final for AEDPA purposes on December 17, 2015, when the time for seeking review in the United States Supreme Court expired. The one-year limitations period began to run that date. *See Jimenez v. Quarterman*, 555 U.S. 113, 119 (2009) (state court conviction does not become final until the 90-day period to seek review in the United States Supreme Court has expired).

The statutory tolling provision of § 2244(d)(2) provides that the time during which a properly filed application for post-conviction relief is pending in state court is not counted toward the limitations period. *See Ott v. Johnson*, 192 F.3d 510, 512 (5th Cir. 1999).

Statutory tolling began when Austin submitted his post-conviction application for filing, which was day 354 of the one-year limitations period. His § 2254 Petition was filed while the application for rehearing was still pending in the Louisiana Supreme Court. Thus, the Petition is timely.

B.    <u>Habeas Corpus Standard of Review</u>

Under 28 U.S.C. § 2254(d), a federal court may only grant relief if the state adjudication "resulted in a decision that was contrary to, or involved an unreasonable application of, clearly established Federal law, as determined by the Supreme Court," or "resulted in a decision that was based on an unreasonable determination of the facts in light of the evidence presented in the State court proceeding."  28 U.S.C. § 2254(d)(1)-(2).  A state court decision is deemed "contrary to" clearly established federal law "if the state court applies a rule that contradicts the governing law set forth in [Supreme Court] cases or if the state court confronts a set of facts that are materially indistinguishable from a decision of [the Supreme Court] and nevertheless arrives at a result different from [the Court's] precedent." *Jenkins v. Hall*, 910 F.3d 828, 832 (5th Cir. 2018) (citing *Lockyer v. Andrade*, 538 U.S. 63, 73 (2003)).

"It is an unreasonable application of Supreme Court precedent 'if the state court identifies the correct governing legal rule from [the] Court's cases but unreasonably applies it to the facts of the particular state prisoner's case.'" *Id.* (quoting *Salts v. Epps*, 676 F.3d 468, 473–74 (5th Cir. 2012)).  The "state court's findings of fact are entitled to a presumption of correctness" that may be overcome only by "clear and convincing evidence." *Leal v. Dretke*, 428 F.3d 543, 548 (5th Cir. 2005).

To obtain habeas relief under § 2254, "a state prisoner must show that the state court's ruling on the claim . . . was so lacking in justification that there was an error well understood and comprehended in existing law beyond any possibility for

11

fairminded disagreement." *White v. Woodall*, 572 U.S. 415, 419–20 (2014) (quotation omitted).

> C.   **Austin cannot establish a *Brady* violation with respect to witness Williamson's criminal history.**

Austin claims that the State "withheld key information about its star witness' current criminal matters in Bossier Parish." ECF No. 1 at 22-23. The post-conviction court found that the claim was unsupported. ECF No. 27-19 at 6.

In *Brady v. Maryland*, 373 U.S. 83, 87 (1963), the Supreme Court held that "suppression by the prosecution of evidence favorable to an accused upon request violates due process where the evidence is material either to guilt or to punishment, irrespective of the good faith or bad faith of the prosecution." The prosecutor's duty to provide favorable evidence includes impeachment evidence and exculpatory evidence. *See United States v. Bagley,* 473 U.S. 667, 676 (1985). The prosecutor's duty to disclose evidence includes both evidence in its own possession and any other "favorable evidence known to the others acting on the government's behalf in the case, including the police." *Kyles v. Whitley*, 514 U.S. 419, 437 (1995).

To prevail on a *Brady* claim, a petitioner must show: (1) the prosecutor suppressed evidence; (2) the evidence is favorable to the defense; and (3) the evidence is material to guilt or punishment. *Brady*, 405 U.S. at 154. "[E]vidence is material only if there is a reasonable probability that, had the evidence been disclosed to the defense, the result of the proceeding would have been different. A 'reasonable probability' is a probability sufficient to undermine confidence in the outcome." *Bagley*, 473 U.S. at 682. "'The question is not whether the defendant would more

12

likely than not have received a different verdict with the evidence,' or whether, 'after discounting the inculpatory evidence in light of the undisclosed evidence, there would not have been enough left to convict.'" *Mahler v. Kaylo*, 537 F.3d 494, 500 (5th Cir. 2008) (quoting *Kyles v. Whitley*, 514 U.S. 419, 437 (1995)).  To succeed on a *Brady* claim, a defendant must "show[ ] that the favorable evidence could reasonably be taken to put the whole case in such a different light as to undermine confidence in the verdict." *Kyles*, 514 U.S. at 435.

On habeas review, the Court must determine "whether the state court's *Brady* determination resulted in a decision that is contrary to, or involved an unreasonable application of, clearly established federal law." *Id.* (citing *Busby v. Dretke*, 359 F.3d 708, 717 (5th Cir. 2004)).  To be successful, Austin "must show that the prosecution's failure to disclose requested impeachment evidence constituted a violation of due process pursuant to *Brady*, and that the state court's application of *Brady* was unreasonable." *LaCaze v. Warden La. Corr. Inst. for Women*, 645 F.3d 728, 735 (5th Cir. 2011) (citing *Mahler*, 537 F.3d at 499.

Austin alleges that witness Mark Williamson had been indicted in Bossier Parish on several felony charges that carried a maximum of 30 years.  ECF No. 1 at 23.  Austin alleges that the State only disclosed that Williamson had a 2005 felony conviction, but not information regarding the pending criminal matter.

The State had "open file discovery" in this case.  ECF No. 27.  And Williamson's criminal conviction and any pending criminal charges were matters of public record. *Brady* rights are not denied where the information was fully available to a defendant.

*See United States v. Dean*, 722 F.2d 92, 95 (5th Cir. 1983); *United States v. Infante*, 404 F.3d 376 387 (5th Cir. 2005) (holding no *Brady* violation occurs where the complained of evidence is a matter of public record, obtainable upon request); *see also Guidry v. Lumpkin*, 2 F.4th 472, 487 (5th Cir. 2021), *cert. denied*, 142 S.Ct. 1212 (2022) ("*Brady* claim fails if the suppressed evidence was discoverable through reasonable due diligence") (citing *Reed v. Stephens*, 739 F.3d 753, 781 (5th Cir. 2014)).

Additionally, Williamson was incarcerated in Texas at the time of trial and had to be transported to Louisiana to testify. ECF No. 27-1 at 25-36. These facts would have alerted the defense to research Williamson's full criminal history. *See Ramey v. Davis,* 314 F.Supp. 3d 785, 820 (S.D. Tex. 2018), *aff'd sub nom. Ramey v. Lumpkin*, 7 F.4th 271 (5th Cir. 2021) ("The fact that the witnesses were all currently jail inmates or had participated in criminal acts with Ramey would have alerted the defense to research their criminal histories.").

Austin has not shown a *Brady* violation regarding Williamson's criminal history. The state court's ruling was not inconsistent with *Brady*.

### D.   Austin cannot establish that the State withheld photographs in violation of *Brady*.

Austin alleges that the State withheld at least two photographs that Detective Ricky Roppolo showed to Williamson during his interview. The prosecution asked Williamson at trial if he had ever seen any photographs of Austin, and Williamson testified that he had seen Austin's Facebook page. ECF No. 27-3 at 65. Williamson testified that he—not Detective Roppolo—pulled up the Facebook photo; showed it to

14

Detective Roppolo; and identified Austin as the person in the photograph. ECF No. 27-3 at 80, 87.

Austin's attorney sought to contradict Williamson's testimony. He attempted to introduce a recording of Williamson's interview that would reportedly show that Detective Roppolo actually presented Williamson with a photo of Austin and identified him to Williamson. ECF No. 1-2 at 25. The trial judge did not allow defense counsel to introduce the recording of the interview.

Although Austin claims there was another photo besides the Facebook photo his post-conviction application only raises the failure to produce "a single Facebook photo." ECF No. 18-2 at 61. In response to the application, the State argued that information about the photo was provided in discovery. ECF No. 28-18 at 13. Even if a copy of the photo was not provided, Austin was aware of the photo and had access to the photo, as it came from his own Facebook page. ECF No. 18-2 at 61.

Austin's attorney indicated that he would be calling Detective Roppolo to testify. ECF No. 27-3 at 99. Thus, he had the opportunity to clarify whether any photographs were shown to Williamson.

Finally, Austin has not shown that the Facebook photo was exculpatory. *Brady*, 405 U.S. at 154. Williamson testified that he saw Austin—whom he identified in court—attacking Terry. ECF No. 27-3 at 69.

The state court's determination that Austin "has not shown that the State withheld material exculpatory evidence in violation of *Brady*" is not an unreasonable determination.

**E.**   <u>Austin cannot establish a constitutional violation regarding the jury instructions and prosecutor's argument.</u>

Austin alleges that the trial court incorrectly instructed the jury on the law of attempted second-degree murder and that the prosecutor cited an improper legal standard.  The judge instructed:

> Second Degree Murder is the killing of a human being when the offender has a specific intent to kill or inflict great bodily harm. Thus, in order to convict the defendant of attempted second-degree murder, you must find that the defendant attempted to kill Mark Williamson and No. (2) that the defendant acted with a specific intent to kill or inflict great bodily harm.

ECF No. 18 at 38.

Second-degree murder is defined as the "killing of a human being when the offender has a specific intent to kill or to inflict great bodily harm."  La. R.S. § 14:30.1(A)(1).  But in a case of attempted second-degree murder, the jury must find that the defendant acted with a specific intent to kill—not just with a specific intent to inflict great bodily harm.  *See* § 10:8. Second degree murder—Specific intent (R.S. 14:30.1(A)(1)), 17 La. Civ. L. Treatise, Criminal Jury Instructions § 10:8 (3d ed.); *see also State v. Cavazos*, 610 So. 2d 127 (La. 1992) (in a case of attempted murder, the intent is to kill, not merely to inflict great bodily harm); *State v. Butler*, 322 So. 2d 189 (La. 1975); *State v. Guin*, 444 So. 2d 625 (La. Ct. App. 3d Cir. 1983); *State v. Linear*, 600 So. 2d 113 (La. Ct. App. 2d Cir. 1992); *State v. Holmes*, 620 So. 2d 436 (La. Ct. App. 3d Cir. 1993).  Therefore, the jury should have been instructed accordingly.

An erroneous jury instruction that improperly includes intent to inflict great bodily harm as an element of attempted second-degree murder is subject to harmless error analysis. *State v. Bishop*, 2001-2548 (La. 1/14/03), 835 So.2d 434, 439 (citing *State v. Hongo*, 96-2060 (La. 12/02/97), 706 So.2d 419).  An invalid instruction on the elements of an offense is harmless if the evidence is otherwise sufficient to support the jury's verdict and the jury would have reached the same result if it had never heard the erroneous instruction. *See Bishop*, 835 So.3d at 439 (citing *Hongo*, 706 So.2d at 421). "The determination is based upon whether the guilty verdict actually rendered in this trial was not attributable to the error." *See Bishop*, 835 So.3d at 439 (citing *Sullivan v. Louisiana*, 508 U.S. 275, 279 (1993)).

As the appellate court concluded, there was sufficient evidence of Austin's specific intent to kill Williamson. *Austin*, 146 So.3d at 725–26.

> The State's evidence concerning Austin's specific intent to kill Williamson begins with the fact that Austin and Weathersby waited for Williamson at the casino and followed him to Gilpin's house.  Beyond a reasonable doubt, Williamson's involvement in drug transactions caused Austin to seek him out on the night in question.  Thus, when Austin entered the home and encountered only Gilpin, the person resisting the break-in behind the closed bathroom door was clearly understood to be Williamson.  Next, the use of the sawed-off shotgun with heavy shot demonstrates the requisite intent to kill.  The level of the blast and its location near the knob indicate that any person in the small bathroom could be killed by the scattering of shot from the gun. With certain facts corroborating Weathersby's version of events, his involvement in the crime did not prevent the jury from crediting some or all of his testimony. Weathersby reported that Austin initially attempted to eject the spent shell and re-cock the shotgun. Failing in that effort, Austin sought to obtain the other gun and threatened to kill Williamson who was lying in the bathroom.
>
> Regarding the fact of Austin's involvement at the scene and his shooting the bathroom door, Gilpin testified that the smaller of the two intruders

shot into the door. The record indicates that Weathersby was the larger man. Austin was tied to the shotgun by the testimony of Walker and Clotiaux. All of this corroborates Weathersby's testimony that Austin fired the shotgun into the bathroom.

The court concluded that the evidence sufficiently shows beyond a reasonable doubt Austin's specific intent to kill Williamson. *Id.* Therefore, the erroneous jury instruction as to attempted second degree murder was harmless.

### F.    Austin cannot establish ineffective assistance of trial counsel.

Austin claims that he was denied effective assistance of counsel when his attorney failed to investigate the criminal background of the State's key witness; failed to investigate and obtain photographs that were material to the defense; failed to introduce critical impeachment evidence to demonstrate the inconsistencies of three of the State's witnesses; failed to relay a favorable plea offer of 3-20 years; failed to object to the prosecution's misstatements of law and the Court's erroneous jury instructions; and failed to investigate the opportunity to suppress evidence unconstitutionally seized by law enforcement during the execution of a search warrant.

To succeed on a claim of ineffective assistance of counsel, a petitioner must show "counsel's representation fell below an objective standard of reasonableness." *Strickland v. Washington*, 466 U.S. 668, 688 (1984). This requires the reviewing court to give great deference to counsel's performance, strongly presuming counsel exercised reasonable professional judgment. *Id.* at 688-690. The right to counsel does not require errorless counsel; instead, a criminal defendant is entitled to reasonably effective assistance. *Boyd v. Estelle*, 661 F.2d 388, 389 (5th Cir. 1981); *see also Rubio*

*v. Estelle*, 689 F.2d 533, 535 (5th Cir. 1982); *Murray v. Maggio*, 736 F.2d 279 (5th Cir. 1984).

Additionally, a petitioner "must show that there is a reasonable probability that, but for counsel's unprofessional errors, the result of the proceeding would have been different. A reasonable probability is a probability sufficient to undermine confidence in the outcome." *Strickland*, 466 U.S. at 694. Petitioner must "affirmatively prove," not just allege, prejudice. *Id.* at 693. If a petitioner fails to prove the prejudice component, the court need not address the question of counsel's performance. *Id.* at 697.

Federal courts do not second-guess an attorney's decision through the distorting lens of hindsight. *See King v. Lynaugh*, 868 F.2d 1400, 1405 (5th Cir. 1989) ("second-guessing is not the test for ineffective assistance of counsel"). Instead, the court presumes counsel's conduct falls within the wide range of reasonable assistance. *Strickland*, 466 U.S. at 689. "No particular set of rules for counsel's conduct can satisfactorily take account of the variety of circumstances faced by defense counsel or the range of legitimate decisions regarding how best to present a criminal defendant." *Strickland*, 466 U.S. at 688-89. "The question is whether an attorney's representation amounted to incompetence under prevailing professional norms, not whether it deviated from best practices or most common custom." *Harrington v. Richter*, 562 U.S. 86, 88 (2011).

Review of an ineffective-assistance-of-counsel claim through the lens of AEDPA means that the petitioner has a higher bar to exceed. "Surmounting

*Strickland's* high bar is never an easy task." *Padilla v. Kentucky*, 559 U.S. 356, 371 (2010). "Establishing that a state court's application of *Strickland* was unreasonable under § 2254(d) is all the more difficult" because "[t]he standards created by *Strickland* and § 2254(d) are both 'highly deferential,' and when the two apply in tandem, review is 'doubly' so." *See Richter*, 562 U.S. at 97-98, 105. Moreover, unreasonableness under *Strickland* and under § 2254(d) are not the same. First, "[t]he *Strickland* standard is a general one, so the range of reasonable applications is substantial." *Id.* Second, "[w]hen § 2254(d) applies, the question is not whether counsel's actions were reasonable. The question is whether there is any reasonable argument that counsel satisfied *Strickland's* deferential standard." *Id.*

In his first ineffective assistance of counsel claim, Austin asserts that his attorney failed to investigate Mark Williamson's criminal background. ECF No. 18 at 43. The State questioned Williamson about his 2005 conviction for possession of a controlled substance and elicited testimony that Williamson was presently incarcerated for violating his parole. ECF No. 27-3 at 63. Williamson stated that he had pending drug charges and was being represented by criminal counsel with respect to those charges. *Id.* at 65.

There is no indication that Austin's attorney was not already aware of this information. Defense counsel chose to focus his cross-examination on Williamson's inconsistent testimony and his identification of Austin as the shooter. Austin's claim that his attorney failed to investigate Williamson's criminal history simply because he did not ask further questions about pending charges is conclusory. Conclusory

assertions are insufficient to furnish a basis for federal habeas corpus relief. *Johnson v. Scott*, 68 F.3d 106, 112 (5th Cir. 1995). Given the deference required, Austin cannot establish his counsel was ineffective in investigating Mark Williamson.

In his second ineffective assistance of counsel claim, Austin alleges that his attorney failed to investigate and obtain photographs that were material to Austin's defense. ECF No. 18 at 46. First, Austin provides no evidence that his attorney did not obtain the Facebook photo. Austin was aware of the photo and had access to the photo, as it came from his own Facebook page. ECF No. 18-2 at 61. Moreover, Austin has not shown that the result of the proceeding would have been different had his attorney questioned Williamson about the photo. Williamson is not the only witness that identified Austin as the shooter. ECF No. 27-2. Thus, Austin cannot "affirmatively prove" prejudice. *Strickland,* 466 U.S. at 693.

Third, Austin alleges that trial counsel failed to introduce "critical impeachment evidence" to demonstrate inconsistencies between investigatory statements and testimony by witnesses Terry Gilpin, Chris Weathersby, and Mark Williamson. ECF No. 18 at 48.

For example, Austin claims that Gilpin initially told investigators he was alone at the house but testified at trial that Williamson was also at the house. Austin points out that Gilpin initially said he was in the hall when Austin shot at the bathroom door but testified at trial that he was on the bed when the gun was fired. ECF No. 18 at 49. Importantly, Gilpin's testimony that the smaller of the two intruders—Austin—fired a gun remained consistent.

Austin claims that Weathersby told investigators that Austin had threatened him with a shotgun but testified at trial that it was a pistol. ECF No. 18 at 50. Austin highlights that Weathersby initially told investigators that Austin wore a black or blue bandana but testified at trial the bandana was green. *Id.* Despite these and other minor inconsistencies revealed, Weathersby never wavered in his testimony that Austin shot Williamson through the bathroom door.

Austin claims that Williamson's testimony also included inconsistencies such as admitting to selling drugs at trial but telling investigators that he was not involved in drugs; testifying that he could see Mr. Austin at the bed with Gilpin but telling investigators that he immediately locked himself in the bathroom. ECF No. 18 at 52. Nonetheless, Williamson testified that Austin is the person who shot him.

Despite minor inconsistencies, all three witnesses testified that Austin—or the smaller of the two intruders—fired the weapon at the bathroom door where Williamson was hiding. Moreover, Austin was tied to the shotgun by testimony from Christa Walker and Dustin Clotiaux. *See Austin*, 146 So.3d at 726. Austin cannot establish that the outcome of the trial would have been different had counsel pointed out each inconsistency. *Strickland,* 466 U.S. at 693.

In his fourth ineffective assistance claim, Austin asserts that his attorney failed to relay a plea offer of 3-20 years. ECF No. 18 at 57. Prior to trial, the State offered Austin a plea agreement with a 20-year sentencing cap. Austin rejected the offer on April 15, 2013, two days before his trial was scheduled to start. ECF No. 21-3 at 1. At trial, during a sidebar about objections to Weathersby's cross-examination,

the prosecutor stated that the 20-year maximum plea deal was still available.  ECF No. 27-3 at 17.  Neither Austin's attorney nor the judge acknowledged the prosecutor's statement, and cross-examination continued.

Defense counsel generally has the duty to communicate formal offers from the prosecution.  *Missouri v. Frye*, 566 U.S. 134, 147 (2012) (attorney failed to communicate plea offer to client before offer expired).  To establish ineffective assistance for failing to communicate a plea offer, the petitioner must demonstrate a reasonable probability that he would have accepted the offer.  *Id.*  The State's formal offer of a 20-year cap was communicated to Austin prior to trial.  The prosecutor's subsequent statement at sidebar did not present a new plea offer.  The terms of the offer had already been relayed to - and rejected by - Austin days before trial was set to begin.  Austin does not allege that he expressed to his attorney a desire to plead guilty at any point prior to or during trial.  Thus, Austin fails to show that he would have accepted the prior plea offer mid-trial.

In his fifth ineffective assistance claim, Austin alleges that his attorney failed to object to the prosecution's misstatements of law and the Court's erroneous jury instructions.  ECF No. 18 at 59-60.  As previously discussed, there was sufficient evidence of Austin's intent to kill Williamson.  Therefore, Austin cannot show that the outcome of the trial would have been different had his attorney objected.

In his final ineffective assistance claim, Austin alleges that his attorney failed to investigate the opportunity to suppress evidence unconstitutionally seized by law enforcement.  ECF No. 18 at 60-61.  Austin states that a judge issued a warrant to

search a residence associated with Austin based on "several pieces of patently false information provided by Detective Brandon Masters. . . ."  ECF No. 18 at 61.

An affidavit used to support a search warrant is presumed to be valid.  *Franks v. Delaware*, 438 U.S. 154, 171 (1978).  The affidavit's veracity may be attacked by showing deliberate falsehood or reckless disregard for the truth by the affiant.  *Id.* "To meet this burden, the challenger must make a substantial showing that (1) allegations in a supporting affidavit were deliberate falsehoods or made with a reckless disregard for the truth, and (2) after the false statements are removed or the improper omissions added, the affidavit is not sufficient to support a finding of probable cause." *Garcia v. Thaler*, 08-CV-3673, 2010 WL 793691, at *7 (S.D. Tex. Mar. 5, 2010) (citing *Moreno v. Dretke*, 450 F.3d 158, 169-70 (5th Cir. 2006)).

Austin claims that his attorney should have filed a motion to suppress any evidence obtained from the allegedly unlawful search.  Austin filed several pro se motions to suppress, which were denied.

Austin claims that the affidavit on which the search warrant is based falsely claims that Deputy Shawn Grooms reported that Gilpin "did not know the intruders [of his home], but described one (1) as a Mexican, and the other a white male."  Austin claims that Deputy Grooms's report did not mention a white male.  Austin also claims that the affidavit misrepresents Christa Walker's statement to police.  Finally, Austin alleges that the affidavit falsely claims that Sandy King told law enforcement that he sold Austin "bad dope" that he obtained from Williamson.  ECF No. 18 at 61.

The four-page affidavit is based on far more identifying information than the few statements Austin highlights. The affiant, Detective Masters, stated that he had worked for the sheriff's office since 2004 and attended numerous schools and training seminars. ECF No. 18-2 at 238. He reported that:

- Gilpin contacted the sheriff's department reporting that he had been shot with a shotgun by two Hispanic males with bandanas covering their face.
- Gilpin initially believed that he had been shot. ECF No. 18-2 at 227.
- Deputy Grooms told him that Gilpin he was sitting on the sofa when officers arrived, with two small wounds; the front door had been knocked off the hinges; a hole was observed in the bathroom door from a type of shotgun blast; the bathtub had shotgun pellet holes in the side, and the bedroom door had been damaged by what appeared to be forced entry.
- Williamson had been at Diamond Jacks Casino; there were two intruders wearing bandanas over their faces—one was armed with a shotgun about three feet long with a wood handle; the intruder confronted Gilpin with a shotgun asking, "where is it?"; Gilpin stated he did not know what he was asking for; one intruder fired shots at the bathroom door, behind which was Williamson.
- Williamson contacted Detective Roppolo stating that he was in town for Gilpin's birthday; he made in-person contact with Sandy King and Heath Leggett at Diamond Jack's; he mentioned going to Gilpin's; while he was in the bathroom at Gilpin's residence, he saw two or three men with bandanas over their faces, armed with weapons; one shot at the bathroom door, and a bullet barely missed his head.
- Sandy King advised he knows Austin and had sold Austin "bad dope" a few weeks ago; King told Austin that Williamson was responsible; he heard that Austin was responsible for Gilpin's home invasion and a home invasion in Dallas where Austin shot two people.
- Christa Walker stated that she knows Austin well; Austin and a Hispanic male had visited her the evening of the shooting; Austin had a short shotgun with him that evening; when Austin returned later, he was sweaty and agitated; Austin told her that he and his friend kicked in Gilpin's door and he shot into the bathroom door; he was attempting to rob Gilpin of narcotics; Austin had bragged about another home invasion in Dallas.
- Chris Stiener stated that he was at Walker's house when Austin and a Hispanic male were there with a sawed-off shotgun the evening of the home invasion; he picked Austin out of a line-up.
- Austin called Walker's cell phone within minutes of the home invasion, and the call was made in the vicinity of the crime scene.

25

ECF No. 18-2 at 239-41.

Despite the few misstatements, the affidavit contains substantial information to support a probable cause finding. With the overwhelming corroborating information in the affidavit, there is no evidence of the affiant's malintent. Austin's allegations to the contrary are conclusory. Therefore, Austin cannot show a reasonable probability that the result of the proceeding would have been different his attorney filed a motion to suppress. Austin has not affirmatively proved prejudice. *See Strickland*, 466 U.S. at 658; *Day v. Quarterman*, 566 F.3d 527, 536 (5th Cir. 2009).

G.    <u>Austin cannot establish factual innocence.</u>

Finally, Austin alleges that he is factually innocent. He asserts that no reasonable juror would have convicted him if he had a fair trial. ECF No. 18 at 63. First, Austin has not established that he was deprived of a fair trial. Regardless, "[t]he Fifth Circuit does not recognize freestanding claims of actual innocence on federal habeas review." *In re Swearingen*, 556 F.3d 344, 348 (5th Cir. 2009); *Herrera v. Collins*, 506 U.S. 390, 417 (1993); *Graves v. Cockrell*, 351 F.3d 143, 151 (5th Cir. 2003) (collecting cases). Instead, "a credible showing of actual innocence" merely allows a prisoner to overcome a procedural default so that his underlying constitutional claims may be considered on the merits. *See Floyd v. Vannoy*, 894 F.3d 143, 154 (5th Cir. 2018) (quotation marks omitted); *Westley v. Kent*, 19-CV-00170, 2022 WL 3456603, at *11 (M.D. La. Aug. 17, 2022).

III.  **Conclusion**

Because Austin cannot establish his entitlement to habeas relief, IT IS RECOMMENDED that his Petition and Amended Petition (ECF Nos. 1, 18) be DENIED and DISMISSED WITH PREJUDICE.

Under the provisions of 28 U.S.C. § 636(b)(1)(c) and Fed. R. Civ. P. 72(b), any party may serve and file with the Clerk of Court written objections to this Report and Recommendation within fourteen (14) days after being served with a copy thereof, unless an extension of time is granted under Fed. R. Civ. P. 6(b).  A party may respond to another party's objections within fourteen (14) days after being served with a copy thereof.  No other briefs (such as supplemental objections or reply briefs) may be filed, unless a party shows good cause and obtains leave of court.  The District Judge will consider timely objections before issuing a final ruling.

A party's failure to file written objections to the proposed factual findings, conclusions, and recommendations contained in this Report and Recommendation within fourteen (14) days after being served with a copy thereof, or within any extension of time granted by the Court under Fed.R.Civ.P. 6(b), shall bar that party from attacking either the factual findings or the legal conclusions accepted by the District Judge, except upon grounds of plain error.

Pursuant to Rule 11(a) of the Rules Governing Section 2254 Cases in the United States District Courts, this Court must issue or deny a certificate of appealability when it enters a final order adverse to the applicant. Unless a circuit justice or district judge issues a certificate of appealability, an appeal may not be taken to the court of appeals. Within 14 days from service of this Report and

Recommendation, the parties may file a memorandum setting forth arguments on whether a certificate of appealability should issue. *See* 28 U.S.C. § 2253(c)(2). A courtesy copy of the memorandum shall be provided to the District Judge at the time of filing.

SIGNED on Monday, December 5, 2022.

JOSEPH H.L. PEREZ-MONTES
UNITED STATES MAGISTRATE JUDGE